UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| PHONG LAM,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No. 18-cv-00936-LB<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**<br><br>Re: ECF No. 26 |

## INTRODUCTION

The plaintiff was camping with his family at an Army Corps of Engineers campsite when a tree collapsed on their tent and injured him.[1] He sued the United States for negligent tree maintenance, and the government moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) on the ground that the plaintiff cannot challenge tree maintenance here because it falls within the discretionary-function exception to the Federal Tort Claims Act ("FTCA").[2] The court grants the motion to dismiss.

---

[1] Compl. – ECF No. 1 at 3 (¶¶ 7–9). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 26 at 5.

ORDER – No. 18-cv-00936-LB

**STATEMENT**

## 1. The Injury

On July 5, 2014, the plaintiff and his family were camping at Kyen Campground, which is "a developed recreation fee based campground that is offered to the public by" the Army Corps of Engineers, as part of the Lake Mendocino Recreation Area in Lake Mendocino, California.[3] At 3:30 a.m., a 60-foot "Interior Live Oak" tree collapsed, knocking down two other nearby trees.[4] One of the trees landed on the plaintiff's tent, injuring his right foot.[5]

## 2. Lake Mendocino and Kyen Recreation Area

The Army Corps of Engineers constructed the Coyote Valley Dam, which created Lake Mendocino.[6] It is about three miles long and a mile wide.[7] By statute, the Corps was authorized to construct recreational facilities at water-resources-development projects such as Lake Mendocino.[8] Lake Mendocino has facilities for camping, picnicking, swimming, fishing, hiking, resource interpretation, and boating.[9] It has six recreation areas (including Kyen), attracts half a million visitors each year, and at times is booked to capacity at its campgrounds.[10] The Kyen recreation area is on the Lake's north shore and offers 93 campsites with access to facilities such as bathrooms, picnic areas, parking, and small trails.[11] Guests pay $20 to camp for the night.[12]

---

[3] Compl. – ECF No. 1 at 3 (¶¶ 7–8); *see* Schooley Decl. – ECF No. 26-1 at 2 (¶ 6).

[4] Compl. – ECF No. 1 at 3 (¶ 7); Shull Decl. – ECF No. 26-5 at 3 (¶¶ 7–8).

[5] Compl. – ECF No. 1 at 3 (¶ 7); Shull Decl. – ECF No. 26–5 at 3 (¶ 7) & Ex. A (Mr. Lam fractured three bones in his right foot and had a large laceration).

[6] Schooley Decl. – ECF No. 26-1 at 2 (¶ 4).

[7] *Id.*

[8] *Id.* (¶ 5).

[9] *Id.*

[10] *Id.*; Compl. – ECF No. 1 at 3–4 (¶ 10) (describing facilities at Kyen).

[11] Schooley Decl. – ECF No. 26-1 at 2 (¶ 6).

[12] *Id.*

"Native tree and shrub species include Oak, Madrone, Fir, Toyon, Manazanita[,] and Ceanothus[;] however, the campground is dominated by Interior Live Oak Woodlands."[13]

### 3. Tree Condition and Inspection

#### 3.1 Inspection of the Trees That Fell

A maintenance worker named Wayne Shull examined the fallen trees that morning.[14] (Mr. Shull has managed trees at Lake Mendocino since 2007, first as a volunteer, then as a Park Ranger, and now as a maintenance worker.[15] He has U.S. Forestry certifications in chainsaw operation and tree climbing; the courses for both certifications included instruction on identification and removal of hazardous trees.[16])

The "Interior Live Oak" (the main tree) broke off at the roots on the ground level and fell on the two adjacent interior live oaks, breaking them off at about four feet above the ground.[17] The main tree showed no visible signs of distress in the main tree bole (such as fungi, cracks, presence of insects, insect damage, or presence of disease), and its canopy was green and healthy.[18] It was growing from a cluster stump and had "minimal lean."[19] The other two trees were young and healthy.[20] Post-incident inspections of the main tree showed "signs of rot in the roots and in the center bole that would not be visible when the tree was standing."[21] "In [his] previous inspections of the particular cluster of trees that fell on July 5, 2014, [Mr. Shull] never found any indications of distress or reason to believe the tree posed a danger to public safety."[22]

---

[13] *Id.*
[14] Shull Decl. – ECF No. 26-5 at 3 (¶ 8).
[15] *Id.* at 1–2 (¶ 2).
[16] *Id.*
[17] *Id.* at 3 (¶ 8).
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* (¶ 9).
[22] *Id.* at 2 (¶ 6).

On October 24, 2014, at the request of the Chief of Operations, a park ranger from the neighboring Lake Sonoma named Lance Pool inspected "the remaining stumps at the site of the fallen tree at Kyen Campground."[23] (Mr. Pool's duties as a ranger "included investigating potential tree hazards during [his] daily patrols and removing hazardous trees."[24]) He "found white to cream colored fungal matter inside the trunks between the bark and interior wood at the ground level," which led him to believe that the "trees were infected by the soil borne fungus Armillaria mellea, commonly known as Shoestring Root Rot or Oak Root Rot."[25] "Armillaria mellea in oaks is difficult to diagnose because the fungus does not usually display any distinct signs except internally."[26] "[A] tree with this disease may show crown die-back or wilting of foliage prior to failure[, which he understood was not the case here, and his] suspicion [was] that the multi-tru[n]k growth in this situation caused the tree to fail from this rot without showing any outward signs."[27] "Since Armillaria mellea is ubiquitous in oak woodland soils, the key to a healthy stand is eliminating conditions that facilitate rot. Thinning the stand to allow sunlight to reach the ground and allowing air circulation will eliminate excess moisture (which is currently being done) and will promote the stand's success. [] I would also recommend removing trees that are having trunk to trunk contact with each other while sharing the same root ball."[28]

---

[23] Pool Decl. – ECF No. 26-6 at 1–2 (¶¶ 1, 4).

[24] *Id.* at 1–2 (¶¶ 1–3), & 4 (filled the role of "tree expert" at Lake Sonoma). He was a certified arborist until 1995 but after finishing college and joining the Corps, he let his certification expire. *Id.* at 2 (¶ 3) & 4.

[25] *Id.* at 2 (¶ 4); *see id.* at 4 (did not see rhizomorphs (string-like fungal bodies)).

[26] *Id.* at 2 (¶ 4).

[27] *Id.; see also id.* at 4 (Lake Mendocino maintenance worker John Dane told him that the trees exhibited normal foliage growth and vigor before the failure); *id.* at 4–5 (contributing factors are (1) the multi-trunk situation, where water and moisture can infiltrate the root ball and lay the ground work for rot, (2) the closed canopy of the dense stand of oaks and madrones that inhibits the drying of the soil by the sun and wind, and (3) multi-trunks grown in contact with each other, growing in circumference each year, and these forces can push apart a rotting root ball and could explain the tree premature failure without any signs or symptoms).

[28] *Id.* at 5.

**3.2 Tree-Inspection Practices — Wayne Shull's Declaration**

Mr. Shull said the following about tree maintenance and inspection processes at Lake Mendocino.[29]

First, "Lake Mendocino does not have written polices mandating certain standards for tree maintenance. In managing the trees, leadership at the Lake was sensitive to the need to balance natural habitat and aesthetic with the safety of the public. I was empowered by leadership to remove hazardous and fallen trees, especially those which impacted campsites."[30]

Second, "Lake Mendocino does not have standard inspection lists," and Mr. Shull relies on his "personal knowledge in [his] inspections."[31]

Third, special training is required to remove hazardous trees safely, and only two United States Corps of Engineers staff members — Mr. Shull and John Dane — handled removal of hazardous trees.[32] If Mr. Shull was unsure about a tree, he asked Mr. Dane to provide his opinion, and if other staff members "notice[d] a tree," they told Mr. Shull or Mr. Dane.[33]

Fourth, "there is no requirement to document tree maintenance," and he "did not personally document [his] maintenance activities."[34]

Fifth, for the past nine years, Mr. Shull has "conducted foot patrols at Lake Mendocino" and "would inspect trees visually for potentially hazardous conditions.[35]

> A Project Staff member would patrol every recreation area every day, including Kyen campground. During these daily foot patrols, I personally spent time looking for trees with noticeable defects such as dead spots, lack of foliage, cankers, fungi or with a large amount of dead branches. If I spotted a tree that concerned me, I would usually take a closer look at the tree. If the tree posed an immediate threat, I would remove the tree that same day or first thing the following morning. If the tree was not an

---

[29] Shull Decl. – ECF No. 26-5.

[30] *Id.* at 2 (¶ 3).

[31] *Id.* (¶ 4).

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* (¶ 5).

immediate threat, I would make a mental note of the tree and return when I had time to remove it.[36]

### 3.3 Tree-Inspection Practices — Christopher Schooley's Declaration

Christopher Schooley, the current Area Operations Manager for Lake Mendocino and Lake Sonoma, and the supervisory park ranger at the time of the accident, explained tree maintenance at Lake Mendocino as follows.[37] (At the time of the accident, he handled day-to-day management at the Lake, including ranger staffing, and he worked with park ranger Wayne Shull and maintenance worker John Dane to coordinate tree-maintenance activities such as scheduling hazardous tree removals, ensuring that they had the resources and training for the task, and scheduling the removals during non-peak recreation seasons.[38])

> 7. The Corps manages and operates Lake Mendocino in accordance with its Operational Management Plan ("OMP"), attached as Exhibit A. The 2013 OMP does not specify mandatory requirements for the Corps and its employees as they inspect and maintain trees at Lake Mendocino. Instead, they provide guidance on how to balance competing policy considerations that impact tree management decisions, including: public safety, employee safety, ecology, wildlife preservation, staffing and budgetary constraints, and park aesthetics.
>
> 8. The OMP is a "continuing and dynamic document" that "guides use, development, and management of the natural and man-made resources" in the region.
>
> 9. Regarding natural resources management, the OMP lays out several long term policy objectives that include safety, health, and preserving "a diversity of ecological communities." The "objectives are to improve or enhance or restore or rehabilitate vegetation and other environmental conditions, including existing structures and features, for wildlife, fisheries, recreation, aesthetics, woodland, and grassland to promote compatible multiple uses in the park."
>
> 10. The OMP states that the goal of the Lake Mendocino recreation program is to "provide quality recreational experiences to a wide spectrum of the public, while ensuring maximum sustained use of park resources consistent with their carrying capacity and aesthetic and biological values."
>
> 11. Consistent with Lake Mendocino's safety goals, the OMP says staff will maintain "an active tree pruning program. . . to insure that all dead trees, limbs, and 'snags' are removed before they present a hazard to the public."

---

[36] *Id.*

[37] Schooley Decl. – ECF No. 26-1 at 1–4 (¶¶ 1–2, 7–18).

[38] *Id.* at 1–2 (¶ 2).

ORDER – No. 18-cv-00936-LB    6

12. The OMP does not set a particular schedule or procedures for hazard tree mitigation, other than to avoid cutting trees during peak season whenever possible because it is "esthetically undesirable and conflicts with recreational usage." The OMP also set a goal of removing 40 hazard trees a year from fiscal years 2013–2017, without specifying locations or other guidelines for removal. Ultimately, the document gives significant discretion to park staff regarding hazard tree mitigation.

13. The OMP identifies several policy considerations related to tree management. For example, when conducting maintenance operations, "it is extremely important to minimize negative impact on trees because "a mature tree, if destroyed, will leave a void that will take years to replace." And staff can consider saving "older trees with unsound limbs and trunks" if they provide shelter for animals, except when it presents a safety hazard at recreation sites.[39]

Mr. Schooley addressed certain engineering manuals and the American National Standards Institute standards for tree maintenance.[40]

14. The Corps does not have written policies mandating certain standards for tree maintenance at Lake Mendocino. Prior to this litigation, I was not intimately aware of the American National Standards Institute ("ANSI") standards and had never personally read them.

15. Engineering Manual 385-1-1 "Safety and Health Requirements," attached as Exhibit B, prescribes occupational safety standards for Army Corps of Engineers employees. It does not set standards for ensuring visitor safety. Accordingly, Section 31 "Tree Maintenance and Removal" requires employees to follow certain safety standards to protect themselves when performing tree maintenance, like wearing protective gear, examining for electrical hazards, and clearing the fall area.

16. I understand that Section 31 references several standards for worker safety while felling and pruning trees, including "ANSI Z133, American National Standard for Arboricultural Operations" and "ANSI A300, American National Standard for Tree Care Operations – Tree, Shrub, and other Woody Plant Management – Standard Practices," and "ANSI/SIA A92.2, American National Standard for Vehicle-Mounted Elevating and Rotating Aerial Devices." However, there is no requirement for the Corps to build a tree maintenance program utilizing these ANSI standards.

17. Engineering Manual 1110-1-400, attached as Exhibit C, primarily governs the design of new facilities and major rehabilitation of existing facilities. It does not prescribe standards for ongoing, day-to-day maintenance. The manual requires a Project Design Team to generally follow ANSI guidelines "throughout the designation of recreation areas or facilities."

18. As part of the litigation, I have been made aware of ANSI A300 (Part 9), attached as Exhibit D. I understand that ANSI A300 (Part 9) suggests best practices for tree risk assessment, such as what to include in an assessment report and what

---

[39] *Id.* at 2–3 (¶¶ 7–13).

[40] *Id.* at 4 (¶¶ 14–18).

ORDER – No. 18-cv-00936-LB                               7

tools to use. However, no regulation requires Lake Mendocino staff to follow ANSI A300 (Part 9)'s standards for identifying hazard trees. Regardless, ANSI A300 (Part 9) says that the entity conducting tree maintenance has ultimate discretion to "select and implement the mitigation, schedule repeat or advanced assessments, and to schedule future monitoring and maintenance."[41]

**4. Other Tree Assessment — Plaintiff's Expert Declaration**

To counter the government's declarations, the plaintiff submitted a declaration from Kent Julin, Ph.D., a certified arborist with 32 years of professional experience in aboriculture and forestry.[42] He provides "professional arborist and forester services throughout Northern California," has undergraduate and graduate degrees in Forestry, and is familiar with the industry standards for tree-risk assessment.[43] He examined photographs and videos taken of the tree cluster about one month after the accident and identified a "large, central trunk cavity (significant structural defect) in the lower trunk are of the subject tree revealed by and clearly visible through two large openings — one 10" diameter and the other 22" diameter. . . ."[44] Based on the proximity to nearby campsites and the condition of the tree, he "would have recommended removal of the subject tree which is critical to minimize personal injury and property damage when hazard trees fail."[45]

Mr. Julin offered the following opinion:

> In my opinion, based upon scientific and expert professional judgment, I found clear evidence that the visual condition of the lower trunk of the subject tree demonstrated two large openings (one 22" diameter, and the other 10" diameter) in the lower trunk of the subject tree, that existed for at least 20 years prior to the accident. A level 2 inspection should have been done, and the hazard tree should have been removed to avoid impact upon campers and other occupants of the campsite. Had the ANSI A300 Standards for Tree Management been followed and implemented by the Kyen

---

[41] *Id.*

[42] Julin Decl – ECF No. 27-1 at 1–3 (¶¶ 1–6).

[43] *Id.*

[44] *Id.* at 3 (¶ 7).

[45] *Id.*

Rangers, the subject hazard tree would have been removed and the injury to Mr. Lam would not have occurred.[46]

He disagreed with Mr. Shull's opinion that signs of rot in the center bole would not be visible.[47] He disagreed with Mr. Pool's opinion — that Armillaria mellea in oaks is difficult to diagnose because the fungus does not display distinct signs except internally — because the 10- to 22-inch holes revealed a significant visible tree hollow in the lower trunk, which in his opinion "was obvious and should have been noticed by any of the rangers . . . and existed on that tree cluster for more than 20 years, and would have been visible to any person inspecting the tree."[48] He points out that the photograph attached to the Shull declaration shows the cavity.[49]

Mr. Julin disagreed with Mr. Schooley's conclusion that the Lake Mendocino 2013 Operational Management Plan did not specify mandatory requirements for the Army Corps regarding tree inspection.[50] Mr. Julin said that the plan specified the following on "its 'priority list' of tasks for 'Hazard Tree Removal': the time period to conduct the hazard tree removal, the cost of removal, the numbers of hazard trees removed, the number and type of staff involved, the equipment to be used[,] and the cost of removing trees."[51] In support of this argument, the plaintiff attaches the Operational Management Plan's five-year program setting the priority lists and task descriptions for fiscal years 2013 to 2017.[52] He references Task 9 — Hazardous Tree Removal, with an initiation date of October 2013, a completion date of May 2015, a cost of $2,800, and a description requiring removal of approximately 40 hazard trees.[53]

Mr. Julin also disagreed with Mr. Schooley's conclusion that the Army Corps did not have written policies mandating standards for tree maintenance at Lake Mendocino and identified that

---

[46] *Id.* (¶ 8).

[47] *Id.* at 3–4 (¶ 9).

[48] *Id.*

[49] *Id.*

[50] *Id.* at 4 (¶ 10) (quoting Schooley Decl. – ECF No. 28-1 at 2 (¶ 7)).

[51] *Id.* (referencing Ex. D to Julin Decl. – ECF No. 27-2 at 3, which lists costs of $2800 for removal of hazardous trees).

[52] Ex. D to Julin Decl. – ECF No. 27-2 at 3–7, 9; *see* Opp. – ECF No. 27 at 6.

[53] Opp. – ECF No. 27 at 6 (citing Ex. D to Julin Decl. – ECF No. 27-2 at 9).

ORDER – No. 18-cv-00936-LB         9

the Corps' Engineering Manual 385-1-1, section 31, sets forth ANSI A309 practices, which include standard practices on tree-risk assessment to remove "defective hazard trees."[54] To support this opinion, the plaintiff excerpts Section 31 of the Operational Management Plan:

SECTION 31

Tree Maintenance and Removal

31.A.1 General. The references used in this section are: ANSI Z133, American National Standards for Aboricultural Operations — Safety Requirements; 29 C.F.R. Part 1910 OSHA General Industry; 29 CFR 1910.269, Electrical Power Generation, Transmission, and Distribution; ANSI A300, American National Standard for Tree Care Operation — Tree, Shrub, and Other Woody Plant Management — Standard Practices; ANSI/SIA A92.2, American National Standard for Vehicle-Mounted Elevating and Rotating Aerial Devices.

31.A.01 Tree felling and maintenance shall be performed IAW a Tree Felling and Maintenance Program that has been developed by/under the direction of a qualified tree worker and in accordance with references above and this Section. This program shall be submitted to the GDA for acceptance prior to work being performed.

   a. The services of other licensed or credentialed professionals may be necessary to properly address the required maintenance to be performed and/or hazards that may be encountered.

   b. Examples of credentialed professionals include but are not limited to: TCIA-accredited Tree Care Company, Certified Arborist, Licensed Tree Care Safety Professional (CTSP), Certified Crane Operator, Rigger or Signalperson, or Certified Utility Safety Professional (CUSP).

31.A.02 Personal protective equipment (PPE), as outlined in this section, shall be required when there is a reasonable probability of injury or illness that can be prevented by such protection.

   a. A hardhat and eye protection should be worn for all tree maintenance and removal operations.

   b. Training shall be provided in the use, care, maintenance, and proper fitting of PPE. See also Section 05.

31.A.03 Working near electrical equipment and systems. > See Section 11 and 29 CFR 1910.269.

   a. Employees working in the proximity of electrical equipment or conductors shall consider them to be energized.[55]

---

[54] Julin Decl. – ECF No. 27-1 at 4–5 (¶ 10) (quoting Schooley Decl. – ECF No. 28-1 at 4 (¶ 14)).

[55] Section 31, Tree Maintenance and Removal, Ex. E to Julin Decl. – ECF No. 27-2 at 25 (underlines and highlights omitted); see Opp. – ECF No. 27 at 5 (citing this section).

ORDER – No. 18-cv-00936-LB            10

**GOVERNING LAW**

**1. Rule 12(b)(1) Subject-Matter Jurisdiction**

A complaint must contain a short and plain statement of the ground for the court's jurisdiction (unless the court already has jurisdiction and the claim needs no new jurisdictional support). Fed. R. Civ. P. 8(a)(1). The plaintiff has the burden of establishing jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994); *Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.,* 907 F.2d 911, 912 (9th Cir. 1990). A defendant's Rule 12(b)(1) jurisdictional attack can be either facial or factual. *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000). "A 'facial' attack asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction, while a 'factual' attack asserts that the complaint's allegations, though adequate on their face to invoke jurisdiction, are untrue." *Courthouse News Serv. v. Planet,* 750 F.3d 776, 780 n.3 (9th Cir. 2014). Under a facial attack, the court "accept[s] all allegations of fact in the complaint as true and construe[s] them in the light most favorable to the plaintiffs." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). In a factual attack, the court "need not presume the truthfulness of the plaintiff's allegations" and "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004). The United States makes a factual attack because it relies on extrinsic evidence to show that the court lacks subject-matter jurisdiction.[56]

If a court dismisses a complaint, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**2. Sovereign Immunity, the FTCA, and the Discretionary-Function Exception**

A district court has no jurisdiction over a lawsuit against the United States unless the United States has waived its sovereign immunity. *Jachetta v. United States,* 653 F.3d 898, 903 (9th Cir. 2011) (quoting *United States v. Mitchell,* 463 U.S. 206, 212 (1983)). The FTCA waives the United

---

[56] Mot. – ECF No. 26 at 5–11.

States' sovereign immunity and allows a lawsuit against the United States when federal employees, in the scope of their employment, cause "injury, loss of property, or personal injury or death." 18 U.S.C. § 1346(b)(1); *Gonzalez v. United States*, 814 F.3d 1022, 1026 (9th Cir. 2016). But the United States is not liable under the FTCA for tort claims that are based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception reflects Congress's desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

"Although a plaintiff normally bears the burden of establishing subject matter jurisdiction, in an FTCA case[,] '[t]he government bears the burden of demonstrating that the discretionary function exception applies." *Steinle v. City and Cnty. of San Francisco,* 230 F. Supp. 3d 994, 1026 (N.D. Cal. 2017) (quoting *Gonzalez,* 814 F.3d at 1027).

Courts apply a two-part test to determine whether the discretionary-function exception applies. *Berkovitz v. United States,* 486 U.S. 531, 536–37 (1988). First, the action must be discretionary, meaning, it "must involve an element of judgment or choice." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002) (citing *Berkovitz*, 486 U.S. at 536). Second, the discretion must be "susceptible to social, economic, or policy analysis." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).

## ANALYSIS

The government moved to dismiss the plaintiff's claim for negligent tree maintenance for lack of subject-matter jurisdiction on the ground that the discretionary-function exemption applies.[57] It contends that decisions about tree maintenance at Lake Mendocino (1) necessarily involve judgment and choice and thus are discretionary, and (2) involve policy analysis because they

---

[57] *Id.* at 5–6.

require staff to consider factors such as financial resources, safety, the environment, and aesthetics.[58] The plaintiff counters that the exemption does not apply because tree inspection (1) is not discretionary and instead is mandatory under the Army Corps of Engineers' Operations Manual, which requires tree inspection under ANSI standards and (2) involves the application of objective scientific standards, which is not policy analysis subject to the discretionary-function exemption.[59] Because decisions about tree maintenance at Lake Mendocino are discretionary and involve policy analysis, the court grants the motion to dismiss.

1. **Discretionary Act**

An act is discretionary if it "necessarily involved an element of judgment or choice." *Chadd v. United States*, 794 F.3d 1104, 1110 (9th Cir. 2015) (quotation omitted). By contrast, the discretionary-function exception does not apply if there is a statute or policy directing "mandatory and specific action" because "there can be no element of discretion when an employee has no rightful option but to adhere to the directive." *Id.* (quotation omitted).

Tree maintenance at Lake Mendocino is discretionary for several reasons. First, the 2013 Operational Management Plan does not mandate specific processes. Instead, it requires only that staff maintain an active tree-pruning program, prune trees during non-peak recreation seasons whenever possible, and remove 40 hazard trees per year from 2013 to 2017.[60] Second, consistent with the Plan, trained staff members identified and removed hazardous trees, especially those that impacted campsites, in part through their daily foot patrols of every recreation area, including Kyen Campground.[61] Third, again consistent with the Plan, trained staff members did not rely on

---

[58] *Id.* at 5.

[59] Opp. – ECF No. 27 at 5–11.

[60] Mot. – ECF No. 26 at 7; Ex. A to Schooley Decl. – ECF Nos. 26-2 at 77 (Bates USA00550), 26-2 at 104 (Bases USA785), 26-4 at 98 (Bates USA886), 102 (Bates USA890), 26-4 at 106 (Bates USA894), 26-4 at 110 (Bates USA898); Schooley Decl. – ECF No. 26–1 at 2–3 (¶¶ 8–13); Shull Decl. – ECF No. 26-5 at 2 (¶ 3).

[61] Shull Decl. – ECF No. 26-5 at 2 (¶¶ 3–5).

[non-existent] written policies or standard inspection lists and instead use their own judgment and personal knowledge to inspect and remove trees.[62]

In cases involving similar facts and similar policies, courts conclude that tree maintenance is a discretionary act.

In *Kobi v. United States*, for example, the plaintiff visited the Swinging Bridge picnic area, which is in a developed space (with "a number of improvements and additions, including fences and picnic tables") in Yosemite National Park. No. 1:15-cv-00478-DAD-BAM, 2016 WL 6599748, at *1 (E.D. Cal. Nov. 7, 2016). An 84-foot tree branch broke from a California Black Oak tree and crushed the plaintiff's right leg and pelvis. *Id.* The Organic Act, which was the relevant federal statute, set out only a general framework for national-park management (such as conserving scenery, providing for public enjoyment of the park, preventing future impairment, and providing for the destruction of animals and plant life "as may be detrimental to the use of any System unit"), and thus, the National Park Service had "discretion to design and implement a policy for evaluating and removing trees." *Id.* at *5 (quoting 54 U.S.C. § 100752 and *Autery v. United States*, 992 F.2d 1523, 1528 (11th Cir. 1993)). The Park Service's policies only "broadly set out the responsibilities of the agency and observe[d] that plant management may be necessary to 'maintain human safety,'" but the policies did not specify a management method and instead said that "discretionary management activities may be undertaken only to the extent that they will not impair park resources and values." *Id.* at *6. Other Park directives required tree inspections on a regular periodic basis and set out possible mitigation efforts, but they did not require any specific methods. *Id.* Moreover, the Yosemite Annual Work Plans set out specific tasks, such as a schedule for identifying and removing hazards during the year, but imposed no mandatory requirements. *Id.* The court concluded that tree maintenance at Yosemite was a discretionary act. *Id.*

Other courts reach similar conclusions results on similar facts. *See, e.g.*, *Autery*, 992 F.2d at 1524, 1528–30 (as two persons drove through a national park, a tree fell on their car, killing one and injuring the other; federal statutory scheme and Park directives gave discretion to the National

---

[62] *Id.*

1   Park Service to design and implement a tree-removal policy; no mandatory statute, regulation, or

2   policy controlled the implementation of the park's unwritten tree-inspection plan, which thus was

3   discretionary); *Kim v. United States*, 1:16-cv-01656-LJO-SKO, 2017 WL 2619129, at *1, 4–7

4   (E.D. Cal. June 16, 2017) (two boys were killed when they were camping in Yosemite, and a tree

5   limb fell on their tent; park policies and practices about tree abatement were discretionary in part

6   because they provided only options and did not mandate methods).[63]

The court follows these cases as persuasive. Like the National Park Service policies and directives in *Autery*, *Kobi*, and *Kim*, Lake Mendocino's policies and practices do not mandate management methods and instead require only a tree-pruning program and the use of trained staff who identified and removed hazardous trees through daily foot patrols based on their knowledge and expertise.[64] Their tree-maintenance actions were discretionary in that they necessarily involved an element of judgment or choice. *See Chadd*, 794 F.3d at 1110. And they did not involve any statute or policy directing "mandatory and specific action." *See id.*; *cf. Fernandez v. United States*, 496 Fed. Appx. 704, 704–06 (9th Cir. 2012) (discretionary-function exception did not apply when policy required the United States Forestry Service to dispose of hazardous trees "as promptly as possible" after it identified them).

Moreover, Ninth Circuit authority supports the conclusion that park policies regarding safety goals are discretionary when the goals are attainable only by the exercise of discretion. *Chadd*, 794 F.3d at 1108–11 (despite directive that "the saving of human life takes precedence over all other management obligations," park officials had discretion — under the federal Organic Act and park policy — to address known hazards such as the non-native male goat who gored and killed a hiker); *Valdez v. United States*, 56 F.3d 1177, 1178, 1180 (9th Cir. 1995) (hiker fell 90 feet down the face of a waterfall in a national park; the park's policy outlined general goals that were attainable only by the exercise of discretionary decisions); *Childers v. United States*, 40 F.3d 973,

---

[63] *See also* Mot. – ECF No. 26 at 6 n.1 (collecting cases).

[64] Ex. A to Schooley Decl. – ECF Nos. 26-2 at 77 (Bates USA00550), 26-2 at 104 (Bases USA785), 26-4 at 98 (Bates USA886)), 26-4 at 102 (Bates USA890), 26-4 at 106 (Bates USA894), 26-4 at 110 (Bates USA898); Schooley Decl. – ECF No. 26–1 at 2–3 (¶¶ 8–13); Shull Decl. – ECF No. 26-5 at 2 (¶¶ 3–5).

976 (9th Cir. 1994) (eleven-year-old boy fell to his death at Yosemite; National Park Service's decisions regarding warnings, trail maintenance, and trail closure were policy-based and required the Park Service to balance access with safety, taking into account conservation and resources in designing area plans and making individual trail determinations).

In sum, the tree-management decisions at Lake Mendocino are discretionary, and the weight of authority supports the conclusion that prong one of the *Berkovitz* test is met.

The plaintiff nonetheless argues that Lake Mendocino has mandatory policies for tree removal.[65] It does not.

First, the plaintiff possibly contends that the Operational Management Plan mandates tree maintenance (and the identification of the alleged hazard here) by its specification of tasks such as the time period to remove hazard trees, the number of hazard trees to remove, the equipment, the cost of removing trees, and the removal of approximately 40 hazard trees annually.[66] Those tasks only "broadly set out responsibilities of the agency" and do not specify a management method. Thus, this argument does not change the conclusion that tree maintenance at Lake Mendocino is a discretionary act. *See Kobi*, 2016 WL 6599748, at *1, 5–6.

Second, citing Section 31 of the Operational Management Plan (set forth in full in the Statement, above), the plaintiff contends that the Operational Management Plan requires tree inspection under ANSI standards.[67] It does not. Section 31 addresses the need for qualified tree workers, training, and the appropriate safety gear.[68] Its citations to ANSI standards are references, not incorporation of standards regarding tree-inspection policies and practice, and the section is primarily directed at employee safety.[69] It does not specify any specific methods and thus does not change the court's conclusion that tree maintenance at Lake Mendocino is a discretionary act.

---

[65] Opp. – ECF No. 27 at 5–6.

[66] *Id.* at 5–6 (citing Ex. D to Julin Decl. – ECF No. 27-2 at 9); Julin Decl. – ECF No. 27-1 at 4–5 (¶ 10).

[67] Opp. – ECF No. 27 at 5–6.

[68] Section 31, Tree Maintenance and Removal, Ex. E to Julin Decl. – ECF No. 27-2 at 25.

[69] *See id.*

**2. Policy Analysis**

The government next contends that decisions about tree maintenance at Lake Mendocino involve policy analysis because they require staff to consider factors such as financial resources, safety, the environment, and aesthetics.[70] Because tree maintenance at Lake Mendocino requires the consideration of these interests, it involves policy analysis, and the government thus meets the second prong of the *Berkovitz* test.

If the government shows (as it did here) that the challenged act is discretionary, then there is a "strong presumption" that its decision involves policy analysis. *Gaubert,* 499 U.S. at 324. To determine whether a government action involves policy analysis, the court does not look to the "agent's subjective weighing of policy considerations" and instead examines "the nature of the Government's action. . . and decide[s] whether it is 'susceptible' to policy analysis under an objective assessment." *Id.* at 325.

At Lake Mendocino, tree maintenance is susceptible to policy analysis because it involves resource allocation, the environment, wildlife, recreational access, public safety, worker safety, and park aesthetics.[71] As the government points out, the Operational Management Plan addresses these criteria by noting the importance of mature trees (and minimizing adverse impact on them), suggesting that tree removal should be during non-peak recreation seasons, addressing safety issues, and considering the public's access to recreational experiences.[72]

In cases involving similar facts and similar policies, courts conclude that tree maintenance involved policy analysis. *See, e.g.*, *Merando v. United States*, 517 F.3d 160, 172 (3rd Cir. 2008); *Hatcher v. United States*, 512 Fed. Appx. 527, 530 (6th Cir. 2013); *Kobi*, 2016 WL 6599748 at *6 (the government "provided abundant evidence indicating that decisions about where, when and how to manage dangers posed by trees . . . implicated larger concerns — economic considerations, employee safety concerns, cultural considerations, and environmental interests"); *Kim*, 2017 WL

---

[70] Mot. – ECF No. 26 at 9–11.

[71] *See* Schooley Decl. – ECF No. 26-1 at 2–3 (¶¶ 7–13) (set forth in full in the Statement, supra).

[72] Mot. – ECF No. 26 at 9 (citing Ex. A to Schooley Decl. – ECF No. 26-3 at 104).

ORDER – No. 18-cv-00936-LB         17

2619129 at *7 (second prong satisfied where guidelines listed "a number of special concerns to be taken into account when managing tree hazards, including environmental, cultural, and archaeological impacts, as well as visitor safety and experience"). Ninth Circuit authority also supports the conclusion that considerations like those at Lake Mendocino are "susceptible" to policy analysis. *See Chadd*, 794 F.3d at 1113 ("park officials evaluated multiple policy considerations in deciding how to manage the problematic goat").

The plaintiff, citing *Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2016), nonetheless argues that tree maintenance involves the application of objective scientific standards, which is not policy analysis.[73] This argument does not change the outcome.

In *Bear Medicine*, the plaintiff was injured and later died when a tree fell on him at a logging site — run through a contract between the Bureau of Indian Affairs (BIA) and a BIA contractor — on the Blackfeet Indian Reservation in Montana. 241 F.3d at 1211–12. The contract had a safety provision that required the contractor to comply with "prescribed safety practices and Federal Law" and gave the BIA the right to suspend operations if the contractor did not comply. *Id.* at 1212, 1215. Under its policy manual, the BIA inspected the logging site regularly. *Id.* Because the BIA was required to ensure that the contractor complied with contract provisions (which included OSHA and internal regulations) and was required to inspect the contractor's operations, it could not claim that its failure to require safety measures or training was a policy judgment insulated from FTCA liability. *Id.* at 1215–1217 (BIA was the only organization with the appropriate safety expertise, and it had virtually complete control of the timber operations on BIA land). By contrast, here, there are no safety duties required by statute, regulations, policies, or otherwise. *Cf. Fernandez*, 496 Fed. Appx. at 704–06 (Forest Service had identified the hazardous tree, and policy required it to dispose of hazardous trees "as promptly as possible" after it identified them).

In contrast to *Bear Medicine*, Lake Mendocino did not have specific safety duties required by statute, regulations, policies, or otherwise. Similarly, and in contrast to *Fernandez*, Lake Mendocino staff had not identified any hazard, and policy, and in any event did not mandate

---

[73] Opp. – ECF No. 27 at 9–11.

ORDER – No. 18-cv-00936-LB 18

disposal of any identified hazard. Decisions involving identification and mitigation of tree hazards were "reliant on the judgment and consideration" of Lake Mendocino staff and did not involve the application of requirements "such that only one course of action was appropriate under the circumstances." *Kobi,* 2016 WL 6599748 at *7.

In sum, prong two of the *Berkovitz* test is satisfied.

# CONCLUSION

The court grants the government's motion to dismiss for lack of subject-matter jurisdiction. This disposes of ECF No. 26.

**IT IS SO ORDERED.**

Dated: May 23, 2019

_____
LAUREL BEELER
United States Magistrate Judge